## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

## CENTRAL DIVISION

| | |
|---|---|
| In re:<br><br>**PETER L. WOODMAN and CYNTHIA M. WOODMAN,**<br><br>        **Debtors.**<br><br>---<br><br>**PETER WOODMAN,**<br><br>        **Plaintiff/Appellant,**<br><br>**vs.**<br><br>**ASPEN HILLS PROPERTIES LLC, CONCEPT 1000, INC., CONCEPT CONSTRUCTION, LLC, MICHAEL HATCH, JERRY HATCH, DAN BOWEN, BRUCE JEPPSEN,**<br><br>        **Defendants/Appellees.** | **MEMORANDUM DECISION AND ORDER**<br><br>**Case No.  2:10CV155DAK**<br><br>**Judge Dale A. Kimball**<br><br>**Bankruptcy Case No. 08-24914**<br>**Adversary Proceeding No. 08-02254** |

This matter is before the court on Appellant Peter Woodman's appeal of the Bankruptcy Court's final Judgment entered on January 5, 2010.  The court held oral argument on the appeal on March 29, 2011.  At the hearing, Appellant was represented by Brian W. Steffensen, and Appellee Concept Construction LLC was represented by G. Troy Parkinson.  The court heard arguments from counsel and took the appeal under advisement.  After carefully considering the

briefs and exhibits submitted by the parties, the arguments advanced by counsel at oral argument, the rulings of the Bankruptcy Court, and the law and facts relating to this appeal, the court renders the following Memorandum Decision and Order affirming the Bankruptcy Court's Judgment.

## BACKGROUND

Appellant Peter Woodman appeals the Bankruptcy Court's determination that Woodman embezzled $603,952 from his employer Concept Construction and Development LLC and that such amount is nondischargeable under 11 U.S.C. § 523(a)(4).

Don Bowen and Bruce Jeppsen incorporated Concept Construction and Development in July, 1998, and converted it to an LLC in late 2003 or early 2004. Concept's construction projects consisted mainly of remodeling hotels and motels throughout the United States. Concept also did some real estate development projects in addition to its remodeling work.

Neither Bowen nor Jeppsen had any training or education in bookkeeping or accounting. Bowen and Jeppsen also traveled extensively to manage and supervise construction projects throughout the United States. In late 2002, Bowen and Jeppsen recognized that Concept's financial data was being poorly managed and they needed an employee to manage the company's finances full-time while Bowen and Jeppsen focused on the construction projects.

In October 2002, Concept employed Woodman pursuant to a contract with Accountemps, a temporary staffing agency. Woodman represented that he had the experience necessary to manage Concept's finances and to take it to the "next level."

In December 2002, while Woodman was a temporary employee, he disbursed $5000 to himself without disclosing to Bowen and Jeppsen that he took this money and without

documenting the reason for taking the money in the company books.  Woodman did not report the $5000 on his 2002 tax return.  Charles J. Preston, one of Concept's expert witnesses, testified that the audit function of Concept's accounting software was turned off around the time when Woodman disbursed this $5000 to himself.

In December 2002, without knowing about the $5000 disbursement or the fact that the audit function of the accounting software had been turned off, Concept hired Woodman as its own full-time employee to perform accounting and bookkeeping responsibilities.  Concept paid Accountemps $5000 to exercise a conversion right.

To document his employment with Concept, Woodman prepared and presented to Jeppsen a letter, dated December 31, 2002, containing the terms of Woodman's employment. The agreement became effective January 1, 2003.  The agreement provided that Woodman would be paid a salary of $60,000 per year and receive an annual bonus.  The provision regarding Woodman's bonus stated: "You will be paid an annual bonus of 20 percent of remodel net income before taxes and bonuses over $300,000.  You may take periodic draws on your bonus throughout the year in the form of payroll draws or company-paid personal expenses.  The sum of these draws will be deducted from your annual bonus."

Woodman understood the bonus provision to mean that he was allowed to estimate the size of the bonus that he would receive at the end of the year and that he could take draws during the year against that anticipated annual bonus.  Concept understood the agreement to provide that Woodman could take periodic draws on his earned bonus throughout the year in the form of payroll advances and company paid personal expenses.  Given the language stating that the bonus was based on net income over a given threshold, the Bankruptcy Court found that the bonus was

3

to be reconciled against actual profits on an annual basis, not based upon projected profits.

In his position as the company's financial officer, Woodman was given broad supervisory responsibilities. In order to carry out his duties, Woodman had access to Concept's financial accounting system and had some authority, acting as a fiduciary, to draw checks on Concept's accounts either on his own signature or by using the signature stamps of the owners of the company.

Given these responsibilities, the parties dispute whether Woodman had carte blanche authority to take any amount of draw on his bonus that he may have deemed appropriate. The issue is not addressed in the employment agreement. Given the testimony at trial, the Bankruptcy Court found that Woodman did not have that kind of unchecked authority to take draws upon or have Concept pay his personal expenses based on his unilaterally projected or anticipated income of the company. Nor could Woodman take draws or pay for personal expenses in an amount in excess of what was earned up to the time of the draw simply because there was cash flow in the company without properly accounting for the draw or personal expense. Furthermore, Woodman could not take draws on his bonus in any manner detrimental to the creditors, employees, and owners of the company or in a way that hid the transaction from Bowen and Jeppsen.

Woodman often hand wrote checks to himself and others, including to vendors working on the remodel of his personal residence. He also paid his personal credit card charges from Concept's funds and signed disbursement checks with the signature stamp of Concept. Woodman also wrote checks using Concept's Quick Books and he signed them with the signature stamp.

From the time that he was a temporary employee at Concept until he was terminated in

4

June of 2005, Woodman took at least $944,805.77 from Concept in excess of his base salary. Adding his salary to the amount increases it to $1,101,254.  During the same time period, Bowen and Jeppsen, the two principals of Concept, took $286,005.97 and $287,759.70, respectively, inclusive of their salaries.

The only personal expense for which Woodman received authorization from Concept was for an expense related to installing cabinets in his home.  Other than that one expense, Concept and its principals were not aware that Woodman was taking or using the amounts of money he took or used for his personal benefit.

Woodman did not declare any of the money he took from Concept, over and above his base salary, as income on his 2002, 2003, 2004, or 2005 tax returns.  At the trial in Bankruptcy Court, Woodman attempted to explain the lack of disclosure to the IRS by testifying that he appended a statement to his tax returns indicating that the return did not include all income he earned from Concept and promising to file amended returns later.  No such statement was produced however.  The "statement attached" referenced on the tax returns relates to the number of dependents claimed by Woodman, not income.  The Bankruptcy Court found that Woodman's testimony explaining his failure to disclose additional earnings to the IRS was not credible.

In March 2003, two months into his full-time employment, Woodman had taken from the company $26,532.69 in excess of his base salary.  All of these payments were made directly to vendors involved in remodeling Woodman's home and every check was filled out by hand by Woodman and then stamped with a signature stamp of Concept.

At the end of 2003, Woodman discussed with Bowen and Jeppsen the possibility of buying into Concept by leveraging his bonus.  In December 2003, Woodman presented Bowen

and Jeppsen a document entitled Concept Buy-in, which Woodman had prepared.  The document

showed Concepts's 2003 earnings before taxes and depreciation as $900,000 and a profit base of

$600,000, making Woodman's bonus $120,000 for 2003.  This document also showed that

Woodman had only taken $7855 toward his expected bonus (the money he obtained approval for

to pay for installing cabinets), that he anticipated taking $15,000 additional monies from his

bonus for his kitchen project, and thus he was left with $97,145 to pay for a 10 percent interest in

Concept.

In fact, prior to Woodman's creation of the buy-in proposal, Woodman had already taken

$197,714 in bonus compensation in 2003.  Woodman, however, had attempted to conceal the

transactions for his personal benefit by altering Concept's books and wrongly classifying,

deleting, and/or failing to account for his excessive personal expenses and draws.  The expert

report and testimony of Alan V. Funk, certified fraud examiner, established 288 incidents of

alteration, deletion, and miscoding of checks in Concept's books by Woodman.  Funk's report

establishes that Woodman took affirmative actions to hide his defalcations from Concept.

Specifically, he manipulated the books and financial records to account for the missing funds or

simply failed to create or maintain corporate records evidencing the receipt of and/or subsequent

payment of funds for his benefit.

Funk's report identifies eight separate ways that Woodman successfully hid the payments

he made to himself or for his benefit, including (1) destruction of bank records, (2) deletions of

disbursement evidence from Concept's ledgers and journals, (3) alterations of payees on

Concept's cash disbursement journals, (4) alterations in the amount of checks, (5) double

paychecks, (6) miscoded checks for his personal benefit as disbursed to other company vendors,

(7) making handwritten checks for his personal benefit and not recording them in the corporate books, and (8) payment of his personal credit card charges using Concept's funds.  The Bankruptcy Court accepted Funk's conclusions as findings of the court.

Woodman admitted that bank records were destroyed.  He claimed that he instructed his assistant, Jill Albin, to first scan bank records into Concept's system to facilitate a "paperless office" and then destroy the paper copy.  Albin denied Woodman's testimony on this point.  The Bankruptcy Court found that Albin credibly testified that she was never instructed to scan bank records and never did, nor could she find any scanned bank records on Concept's computer system after Woodman was terminated.  Albin and Concept were required to obtain copies of the missing bank records directly from the bank.

Other than Woodman's proposal for a buy-in, there is no writing stating that he in fact purchased an ownership interest.  There is no check or accounting of the transaction.  There are also no corporate records of any ownership interest.  In addition, there are no corporate or personal tax records indicating that he had an ownership interest.  Woodman claims that Bowen and Jeppsen were so pleased with his performance that they made him a 10 percent owner as of January 1, 2004, and then made him a 20 percent owner of Concept as of January 1, 2005.  The Bankruptcy Court found that Woodman's assertions that he was an owner were significantly undercut by his own failing to account or report such ownership to the IRS.

On cross examination, Bowen did not dispute that Woodman had become an owner, but later Bowen testified that Woodman's ownership interest was subject to additional consideration which was never paid.  There was no evidence that an ownership was given to Woodman based on his performance.  Based on Bowen and Jeppsen's denial and the lack of any evidence to

7

support such a claim, the Bankruptcy Court determined that Woodman never became an owner of Concept.  The Bankruptcy Court also noted that given that Woodman had already withdrawn more money from the company than the amount of his bonus, to the extent that Woodman claimed that he could capitalize his bonus amounts to pay for an ownership interest, there was none to capitalize.

When Woodman was away on a family vacation in June 2005, Albin reviewed a bank statement that came in the mail and noticed irregularities and suspicious transactions.  She reported her concerns to Concept's principals.  Prior to this time, Woodman never allowed Albin to review bank statements.  The Bankruptcy Court specifically stated that Albin's testimony was credible.  The Bankruptcy Court found that she had no motive to be untruthful because she and Woodman's families were friends and she had been hired by Woodman to be his assistant.

The Bankruptcy Court noted that Woodman admitted to using handwritten checks to pay his vendors and suppliers which he then stamped with the signature stamp.  Woodman also admitted to making payments to his credit card companies, including CitiBank, from Concept's account.  Although Woodman claimed that his CitiBank card was only used for business expenses, his testimony was refuted by his own testimony on cross examination when he was required to analyze a statement and he admitted that there were no business expenses on the statement.

The Bankruptcy Court also noted that despite Woodman's claims that he only took money out of the company based on his own estimation of his potential bonus, there was evidence that Woodman continued to take considerable personal draws and pay personal expenses using Concept's funds even when he knew that Concept was in financial distress and

having difficulty obtaining funds to pay vendors.  Woodman testified that he would have to purchase cashier's checks to pay for his vendors because Concept checks had been returned for insufficient funds.  The Bankruptcy Court found that is was not credible that Woodman believed there would be a bonus large enough to cover his draws if checks for Concept were being returned for insufficient funds.

The Bankruptcy court also found that Woodman's testimony that he properly accounted for his personal transactions and that someone manipulated the transactions to frame him was not credible.  Woodman had claimed that he was framed because he had requested that Concept begin paying its taxes correctly.  Evidence demonstrated, however, that Woodman's own tax returns showed non-reported income.  On his taxes, he never declared more than his base salary.

The expert report and testimony of Jeffrey B. Jensen, CPA, shows that Concept's net income for 2003 was $279,341, for 2004 was $790,119, and prorated for 2005 to the time of June 15th, was $369,058.  Concepts amended returns included the following deductions for embezzled funds: in 2003, 197,714; in 2004, 680,000 and 243,000; and, in 2005, $333,602.

The Bankruptcy Court found the testimony and expert report of Jensen to be reliable and credible.  The court found Concept's income and Woodman's possible bonuses to be as follows: For 2003, $477,055 in income for Concept and bonus of $35,411 for Woodman; for 2004, $1,470,362 in income for Concept and bonus of $234,072 for Woodman; and, for 2005, prorated, $702,660 in income for Concept and bonus of $80,532 for Woodman.  The total amount of Woodman's entitled bonuses for those years, therefore, was $350,015.   Using Funk's number of $953,967 as the amount of money taken by Woodman in addition to his base salary, and subtracting Woodman's entitled bonus amount of $350,015, the Bankruptcy Court determined

that Woodman had embezzled $603,952 from Concept.

## DISCUSSION

Woodman advances four main arguments on appeal: (1) the Bankruptcy Court improperly construed the employment agreement; (2) the Bankruptcy Court erroneously allowed the issue of ownership to be part of the trial; (3) the Bankruptcy Court erred in finding that Woodman was not an owner of Concept; and (4) the Bankruptcy Court erred in allowing the testimony and report of Jeffrey B. Jensen, CPA.

**(1) Employment Agreement**

First, Woodman asserts that the bonus provision of his employment agreement with Concept was clear and unambiguous.  Woodman contends that the Bankruptcy Court improperly construed the provision and improperly allowed in parol evidence to read into the agreement requirements that are not present on the face of the agreement.

The provision regarding Woodman's bonus states: "You will be paid an annual bonus of 20 percent of remodel net income before taxes and bonuses over $300,000.  You may take periodic draws on your bonus throughout the year in the form of payroll draws or company-paid personal expenses.  The sum of these draws will be deducted from your annual bonus."

The parties have two main disputes with respect to this provision.  First, the parties disagree as to what the "plain" language of the agreement states with respect to when Woodman was allowed to take a payroll draw or have company-paid personal expenses.  Concept asserts that because the bonus was an annual bonus and the amount of Woodman's bonus required a determination of a percentage of net income above a $300,000 threshold, the payroll draw and company-paid expenses had to occur at the end of the year.  If payroll draws or company-paid

10

expenses occurred before the end of the year bonus determination, Concept states that the payroll

draw or expense would have to have been reasonable and approved by Jeppson and Bowen.

Woodman, however, contends that the language of the agreement allowed him to anticipate or

project what he believed would be the net income and that he could take a payroll draw or have

company-paid personal expenses from the beginning of the year.

Second, the parties also dispute whether Woodman was required to get permission from

or give notice to the principals of the company prior to taking a payroll advance or having the

company pay personal expenses.  Woodman asserts that the language of the agreement states that

he "may take" the advances and it does not mention the need for permission.  Concept, however,

contends that just because the agreement does not mention notice or permission does not mean

that it was not a requirement.  Concept argues that the need to give notice was implicit and

Woodman did it on at least one occasion when he got a payroll advance for installing cabinets at

his home.

As an initial matter, Woodman argues that the Bankruptcy Court erred in adopting

Concept's interpretation of the agreement without making a specific finding that the agreement

was ambiguous.  Woodman cites to a ruling from the Utah Court of Appeals for the proposition

that a trial court must make such a finding prior to considering extrinsic evidence.  *See Wilson v.*

*Johnson*, 234 P.3d 1156, 1159 (Utah Ct. App. 2010).  In *Wilson*, the court stated "[o]nly if the

terms of the contract are ambiguous should the court consider extrinsic evidence." *Id.*  The court

further explained that "[a] contract is ambiguous 'if it is capable of more than one reasonable

interpretation because of uncertain meanings of terms, missing terms, or other facial

deficiencies.'" *Id.* (citation omitted).  "'[C]ontractual ambiguity can occur in two different

11

contexts: (1) facial ambiguity with regard to the language of the contract an (2) ambiguity with regard to the intent of the contracting parties.'" *Id.* "Facial ambiguity is a question of law, while the intent of the parties is a question of fact.  Before the court may consider extrinsic evidence of the parties' intent, however, it must first conclude that the contract is facially ambiguous.  Although the court may consider extrinsic evidence to determine whether the contract is facially ambiguous, that evidence may not be used to contradict the plain language of the contract."  *Id.*

The court does not read the *Wilson* court's discussion of contractual ambiguity to require a court to make an explicit finding of ambiguity prior to determining which parties' respective interpretation is most supported by the language of the agreement.  In this case, Judge Thurman did not specifically state that the agreement was ambiguous.  It is clear, however, that both parties were arguing for differing interpretations of the contractual language.  It is also clear based on the parties' disputes and the face of the agreement, that the employment agreement has several missing terms.  The court does not find anything in the *Wilson* court's analysis of contractual ambiguity that would require Judge Thurman to make a specific conclusion of ambiguity when it was clear to everyone participating in the proceedings that it was ambiguous.

As in *Wilson*, both parties in this case believe "the contract is unambiguous and must be read in support of their respective positions," when, in fact, the contract is ambiguous due to missing terms and other facial deficiencies.  *See id* at 1162.  Although Woodman asserts that the agreement is clear and unambiguous, there is no language in the agreement allowing Woodman to take draws or have Concept pay his personal expenses based on his unilaterally anticipated or projected bonus.  Just as Woodman claims that Concept and the Bankruptcy Court read requirements into the agreement that were not present, so does Woodman.  Woodman's

contention suggesting that there were no limits to his ability to take advances is completely unreasonable.  Nothing in the language of the agreement supports Woodman taking bonuses on how he felt the company was doing on any particular day.  The language of the agreement refers to an annual bonus and net income, which would require an accounting of monies going in and out for the year.  Concept's interpretation of the agreement, requiring the bonus to be awarded based on earned net income, is more supported by the language in the agreement than Woodman's interpretation.

The agreement is facially deficient in failing to state when the bonus would be paid.  The agreement also fails to state the procedure for how or when the payroll advances or company-paid expenses should be done.  The failure of the agreement to address these basic issues makes it ambiguous.  The agreement, written by Woodman, gives a general outline for the terms of his employment but provides for few details for the practical implementation of those terms. Because of these ambiguities, the Bankruptcy Court properly relied on parol evidence in determining the better interpretation of the agreement.

There is substantial evidence from the trial supporting the Bankruptcy Court's interpretation of the agreement.  The Bankruptcy Court was in a position to best determine the credibility of the witnesses regarding their intent and their testimony as to the day-to-day practices of the company.  This court defers to the Bankruptcy Court's determination of credibility.  Moreover, the Bankruptcy Court's determinations of credibility are supported by documentary evidence in every instance.  The Bankruptcy Court found it most credible that bonuses had to be paid on actual profits and must be approved by the owners.  As stated above, the testimony that the bonus had to be based on earned profits is most consistent with the

13

language of the agreement.  In addition, it appears most consistent with the parties' practices. Woodman's buy-in proposal, prepared in December 2003, reconciled the yearly net income above the $300,000 threshold, subtracting only the $7500 advance that Woodman had been granted permission to take and $15,000 of the bonus that Woodman intended to take and use for his personal home remodel.  Woodman then calculated that he had the rest of his annual bonus to contribute to paying for an ownership interest.  Woodman did not prepare this proposal at the beginning of 2003.  He waited until the end of the year.  This proposal shows that in practice the parties calculated the bonus at the end of the year.

The Bankruptcy Court also properly found that the testimony that there was some need for communication among the owners of the company with regard to the periodic draws on the bonus was credible.  This finding was supported by evidence that, in practice, permission for the draws was sought.  The only draw that was properly documented as being received by Woodman was the $7500 he took for the installation of cabinets at his home.  Woodman asked and received permission for that money.  The fact that Woodman got permission for the only documented draw demonstrates that the principals of Concept were operating with the understanding that he would communicate with them regarding money being taken for personal use.

Woodman argues that the agreement states that he "may take" the periodic draws on his bonus throughout the year and such language allowed him to unilaterally determine when to do it.  As stated, however, the agreement fails to state any specifics as to the practical procedures for taking such draws.  By arguing that he is entitled to take such draws unilaterally at anytime throughout the year is supplying terms not present in the agreement.  Woodman similarly claims that the Bankruptcy Court's adoption of Concept's interpretation on this dispute supplies

additional terms to the agreement.  However, Concept's interpretation is supported by other evidence and is a reasonable interpretation of the agreement.  Woodman's interpretation is not supported by any evidence but his own testimony.

Woodman further argues that Concept did not meet its burden of showing that Woodman did not have a reasonable belief that his anticipated bonus would be large enough to justify each of his draws.  The court, however, finds that Concept sufficiently met its burden.  In Woodman's December 2003 buy-in proposal, Woodman calculated that he was entitled to a $120,000 bonus and he had already taken $197,000 in addition to his base salary.  This evidence demonstrates that even if Woodman was attempting to anticipate his expected bonus, he was on notice as of that date that he had significantly miscalculated.  However, his conduct did not change.  There is no evidence that he applied any of the additional money he took in 2003 to his anticipated bonus in 2004 in order to repay his amounts.  In fact, he did not document the amounts he was taking.

Significantly, the Bankruptcy Court noted that even when Concept was experiencing financial problems with cash flow in 2005, Woodman took his own personal draws from the company in cashier's checks while Concept's vendor's checks were being returned for insufficient funds.  If Woodman was attempting to anticipate or project his annual bonus, the court agrees with the Bankruptcy Court that it was unreasonable for him to be taking money out of the company at such a time.

Woodman claims that Concept was growing and its financials were "skyrocketing," but there is no evidence in the record to support his claims.  His claims also appear to be in conflict with the evidence that Concept was failing to pay its vendors in 2005.

Furthermore, although Woodman asks this court to analyze these issues separate from the

determination of embezzlement, it is difficult to address the issue of whether Woodman reasonably believed he would be entitled to bonuses in the amount of money he was taking from Concept without acknowledging that he was taking money without accounting for the fact that it was going to him.  Woodman's buy-in proposal in December 2003 demonstrates the difficulty in addressing the issues in a vacuum.  He properly calculates that he is entitled to a $120,000 bonus under the terms of the agreement, he admits to taking a $7500 draw on the bonus because he sought permission for that draw, but does not acknowledge that he had taken another $197,000 from the company for personal use.  This conduct demonstrates that he was not merely operating under a contrary interpretation of the employment agreement.  Woodman also failed to report any of the additional money he was taking as income on his taxes.  He took significantly more money from the company than either of the two owners, and he took actions specifically intended to hide the amount of money he was receiving from Concept.  Woodman did not appeal the Bankruptcy Court's determination that he was responsible for the manipulations of Concept's record keeping and that he appropriated funds to himself in excess of what he was entitled in a manner to hide such appropriations so he would not need to account for them.  Woodman's argument that he had a different interpretation of the employment agreement does not overcome the actual evidence of intent.  There is no basis in the record for Woodman's assertion that Concept failed in its burden of showing scienter.

(2) **Ownership Issue**

Next, Woodman argues that the Bankruptcy Court erred when it allowed Concept to argue that the 20% ownership in Concept that had been given to Woodman, should be taken away.  Woodman states that such a claim was never raised in the counterclaim, and should be

barred as an omitted compulsory counterclaim and by the statute of limitations.  He further states
that it was a denial of due process to allow such an issue at trial because it denied Woodman an
fair opportunity to prepare for and address it.

Although Woodman asserts that it is undisputed that he had an ownership interest in
Concept, the issue was disputed and the Bankruptcy Court found that he never became an owner.
Despite Woodman's characterization of the issue, Concept's arguments and the Bankruptcy
Court's findings that he was not an owner are not based solely on a rescission claim.  The
Bankruptcy Court found that there was no documentary evidence to support a finding that
Woodman became an owner.  Woodman incorrectly attempts to portray the Bankruptcy Court's
ruling as taking away an existing ownership interest and such is not the case.

Woodman complains that the ownership issue was not raised as an affirmative claim for
relief.  However, Concept's claim has always been that Woodman embezzled money–in other
words, he took money in an amount that exceeded that to which he was entitled "either in his role
as an employee or for any other purpose."  Concept's state lawsuit filed against Woodman one
month after he was terminated alleged this.  Then, after Woodman filed bankruptcy and the
automatic stay prevented the continuation of the state action and the dispute became an adversary
proceeding in Bankruptcy Court, Concept raised embezzlement as a counterclaim.  In response to
Concept's embezzlement claim, Woodman asserted that he was entitled to all amounts he took
from Concept based on his employment contract and his alleged ownership in the company.
Woodman's alleged ownership in the company, therefore, is not a separate claim for relief but a
defense to Concept's embezzlement claim.

Because the issue of Woodman's ownership of Concept was a defense to Concept's

embezzlement claim, it was not a compulsory counterclaim or subject to the statute of limitations. Woodman's claims to be surprised and unprepared to address the issue is unpersuasive.  It had long been the subject of discovery and was referenced in Concept's Answer to the Adversary Proceeding Complaint.

There was no surprise or denial of due process with respect to the ownership issue. Concept admits that it negotiated with Woodman regarding his purchase of an ownership interest.  Concept, however, has consistently held the position that Woodman never made the $100,000 payment in order to get a 10 percent interest and fraudulently manufactured financial statements of Concept for the purpose of making it appear that he would be making the $100,000 payment.  Woodman has been on notice since the state law action that Concept did not recognize him as an owner.

In addition, Woodman asserts that the Bankruptcy Court erred when it ruled that Woodman never became an owner of Concept.  Woodman states that the evidence is unequivocal that Woodman was made an owner and the Bankruptcy Court's finding is contrary to the clear weight of the evidence.

Woodman's arguments significantly misrepresent the Bankruptcy Court's finding. Woodman improperly relies on only two answers by Bowen, one of Concept's owners. He makes no attempt to marshal all of the evidence in support of the Bankruptcy Court's finding.  In fact, he ignores the majority of the Bankruptcy Court's discussion of the issue.

The Bankruptcy Court's finding that Woodman never became an owner of Concept is supported by substantial evidence.  The evidence was clear that Bowen and Jeppsen negotiated with Woodman in 2003 to allow him to buy into the company using accumulated bonus monies.

18

Bowen testified that Woodman had the opportunity to become an owner by withdrawing the bonus and making payment but that Woodman never satisfied those conditions.  Additionally, Woodman's purported ownership was never documented by any business records, corporate records, or IRS records.  The Bankruptcy Court specifically stated that Woodman's assertion that he was an owner was significantly undercut by his own failing to account or report such to the IRS.

Woodman completely ignores this evidence and asserts that it is undisputed that he became a partner based on one portion of Bowen's testimony. Woodman fails to acknowledge that the Bankruptcy Court mentioned this testimony and stated that Bowen later testified that Woodman had failed to meet the requirements for becoming a partner.  The Bankruptcy Court clearly considered all of Bowen's testimony, not just individual answers, considered documentary evidence, and made its finding based on all of the evidence before it.  This court agrees with the Bankruptcy Court's finding that Woodman never became an owner of Concept.[1]

### (3) Testimony of Jeffrey B. Jensen, CPA

Finally, Woodman argues that the Bankruptcy Court erred when it overruled Woodman's objections to Jensen's accounting testimony and denied Woodman's motion to strike it. Woodman claims that given the problems with Jensen's testimony, the Bankruptcy Court's

---

[1]  The court notes that while Woodman challenges what may appear to be a change in Bowen's position with respect to Woodman's ownership interest, Woodman's assertions regarding his ownership interest are also far from clear.  Woodman argues to this court that he was given the ownership interest for good performance.  There is no evidence in the record to support that assertion.  The only evidence in the record deals with whether Woodman paid for his ownership interest.  In any event, the court agrees with the Bankruptcy Court that the best evidence on this issue is the lack of documentary evidence identifying Woodman as an owner, especially Woodman's failure to declare himself an owner to the IRS.

rulings as to damages lack foundation and are speculative.

Jensen is a qualified CPA hired by Concept to reconstruct its books after Alan Funk, a certified fraud examiner, discovered the fraud perpetrated by Woodman. The court correctly found Jensen's testimony to be credible and reliable. Woodman was able to address each of the claims of alleged deficiencies through Woodman's cross-examination at trial. The court was able to scrutinize those alleged deficiencies and it determined that Jensen's testimony was reliable.

The major failings identified by Woodman were (1) that the report did not take into account the proper salaries for Woodman, Bowen, and Jeppsen for 2003, 2004, and 2005, (2) that the accounting was done on a cash basis as opposed to an accrual basis, and (3) that the report did not take into account Woodman's alleged ownership interest.

Woodman's testimony regarding salary increases, which the Bankruptcy Court concluded was not credible, was insufficient to discredit Jensen's findings. Only Woodman testified that his salary increased in 2004 and 2005. Woodman, however, did not report his salary increase on his tax returns and no other witness testified that salaries increased.

In addition, Jensen testified that he could find no evidence in Concept's books that the accrual method was used. There is no testimony in the record that Concept used the accrual method.

Finally, the report did not take into account any ownership interest by Woodman because he did not have any interest. The court has already affirmed the Bankruptcy Court's finding on the ownership issue.

The Bankruptcy Court considered Jensen's report and testimony and, in fact, recalculated

the profit base from which Woodman's bonus was derived.  It was well within the court's

discretion to accept Jensen's testimony as the best evidence of Concept's profitability from

which to calculate Woodman's entitlement to a bonus.  *Miller v. Pfizer, Inc.*, 356 F.3d 1326,

1335 (10th Cir. 2004) (evidentiary ruling with respect to expert testimony is reviewed under the

abuse of discretion standard).  The Bankruptcy Court's reliance on Jensen's testimony and report

does not provide a basis for reversal.

**CONCLUSION**

Based on the above reasoning, the court finds Woodman's challenges to the Bankruptcy

Court's rulings to be without merit and the court affirms the Bankruptcy Court's Judgment in its

entirety.  Because this Memorandum Decision and Order disposes of the appeal, the Clerk of

Court is directed to close the case.

DATED this 31st day of March, 2011.

BY THE COURT:


DALE A. KIMBALL,
UNITED STATES DISTRICT JUDGE